FILED
United States Court of Appeals
Tenth Circuit

May 3, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

KATHY M. GEORGE, on behalf of the
Estate of Troy Bradshaw,

    Plaintiff - Appellant,

v.

BEAVER COUNTY, by and through the
Beaver County Board of Commissioners;
CAMERON M. NOEL; RANDALL
ROSE; DOES 1-10, inclusive,

    Defendants - Appellees.

No. 21-4006

_____

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:16-CV-01076-TS)**

_____

Eric Boyd Vogeler, Vogeler, PLLC, Salt Lake City, Utah, for Plaintiff-Appellant.

Andrew R. Hopkins, Mylar Law, P.C. (Frank D. Mylar with him on the brief), Salt Lake
City, Utah, for Defendants-Appellees.

_____

Before **HOLMES**, **McHUGH**, and **CARSON**, Circuit Judges.

_____

**CARSON**, Circuit Judge.

_____

    Order requires respecting policy.  And volatile prison environments demand

consistent training on institutional policies.  But failing to follow prison policy is not

a constitutional violation in and of itself.  Successful 42 U.S.C. § 1983 municipal-

and supervisory-liability claims involve a constitutional violation or pattern of

constitutional violations.  Violating policy alone supports neither.

We treat jail-suicide claims, like Plaintiff's, as failures to provide medical

care.  Such claims require proof that a prison official acted with deliberate

indifference to the detainee's serious medical needs, violating the Eighth, or

Fourteenth, Amendment.  Although Plaintiff proved that certain officers failed to

follow Beaver County's suicide-prevention policy, the district court granted summary

judgment (1) to the County because Plaintiff failed to show it employed an

unconstitutional policy and (2) to Sheriff Noel and Corporal Rose because the law

entitles them to qualified immunity.  We exercise jurisdiction under 28 U.S.C. § 1291

and affirm.

## I.

Beaver County Correctional Facility's ("BCCF") suicide-prevention policy

requires officers to screen all prisoners for suicide risk.  When screening suggests

such a risk, officers must keep that prisoner in an observation cell in the booking

area, check on him every fifteen minutes, and remove all property or implements that

could be used for suicide.  BCCF's practice was to give inmates on suicide watch

only a suicide smock to wear and only a suicide-proof blanket for bedding.  Once an

officer places a prisoner on suicide watch, only a medical or mental-health provider

may remove him.  BCCF Officers may view BCCF's policy handbook, containing the

suicide-prevention policy, on every computer in the facility. And officers must also

complete a twelve-week training program at the Utah Peace Officer Standards and Training ("POST") Academy followed by forty hours of annual training, which includes a four-hour suicide prevention training. All deputies involved in this lawsuit are POST-certified officers in good standing. And before the events that occurred in this case, no inmate had ever committed suicide at the BCCF.

On June 13, Beaver County officers responded to reports of a truck running into parked cars. The decedent, Troy Bradshaw, drove the truck. When officers encountered him at the scene, he smelled of alcohol, spoke incoherently, and could barely stand and walk. The officers arrested Bradshaw for driving under the influence and placed him in Deputy Nathan Bastian's vehicle. Once in the patrol vehicle, Bradshaw complained of pain, so Deputy Bastian transported him to Beaver Valley Hospital. At the hospital, Bradshaw complained that his handcuffs hurt his left hand. When Deputy Bastian and Sergeant Laura Davis checked the cuffs, they discovered he was missing a finger from a previous injury. To avoid that injury from causing him discomfort, they instead uncuffed his wrists and cuffed his arms to the hospital bed. At the hospital, Bradshaw twice asked Sergeant Davis to kill him. The hospital cleared Bradshaw, and Deputy Bastian transported him to the BCCF.

At the BCCF, Deputy Cody Allen had Bradshaw take a breath test. Deputy Allen then completed the Initial Arrestee Assessment (IAA), which reflects that Bradshaw previously considered suicide; was not thinking about it currently; had a brother who committed or attempted suicide; and was intoxicated. Bradshaw stated that he would kill himself if placed in a cell.

3

After the IAA, the officers placed Bradshaw on suicide watch. Three corrections officers and Deputy Allen walked Bradshaw to a holding cell in the booking area. Deputy Allen told Bradshaw that he would be in cell two—a "dry" cell without a toilet. Bradshaw moved away from Deputy Allen and said he would not go into the cell. Deputy Bastian grabbed Bradshaw's arm, and Bradshaw resisted. The officers then forced Bradshaw down to the ground, where Sergeant Davis secured his legs. Sergeant Davis ordered Bradshaw to stop resisting. He complied, and the officers rolled him on his side and placed him in cell two. Bradshaw beat on the cell door for two to three hours. Officers did not place him in a safety smock or create a suicide watch log, in violation of BCCF's suicide-prevention policy, but Corporal Sarah Kinross monitored Bradshaw by sitting in the booking area all night. Corporal Kinross's June 14, 2014 shift-change report reflected that Bradshaw was suicidal and in cell two. Corporal Kinross stated that, as a matter of practice, she would have orally passed this information on to Corporal Randall ("Randie") Rose, the oncoming corporal, but could not recall if that happened.[1]

By June 14, 2014, Bradshaw was no longer acting violently, and Officer Shawn Higgins transferred Bradshaw from cell two to cell three. While cell three is in the booking area, it has a toilet, sink, and bed. Some officers were unaware that Bradshaw was on suicide watch. Corporal Rose was on duty when Bradshaw moved

---

[1] Defendant Rose testified that BCCF officers conveyed shift-change information to the oncoming shift orally, via handwritten notes in the control room, or by written reports. At least with oral shift-change reports, in 2014, BCCF had no specific written policy for how that should be done.

to cell three. While in cell three, Bradshaw received bedding, but the record does not reveal who gave it to him. Some officers may have thought that moving Bradshaw to cell three meant he was no longer on suicide watch because cell two ordinarily housed suicidal inmates (and without bedding), though BCCF sometimes kept suicidal inmates in cells one and three.

That same day, officers completed a second assessment of Bradshaw as part of the booking process. Corporal Rose, present for the assessment, heard Bradshaw respond "yes," when asked if he was thinking about committing suicide. The assessment conveyed Bradshaw was suicidal and should be on suicide watch. During the booking process, before officers placed him in a cell, a nurse saw Bradshaw, still wearing his street clothes. Concerned that Bradshaw would go into shock, the nurse directed officers to provide him a blanket. Bradshaw received his bedroll, which included a blanket, sheet, and pillowcase, while in cell three. Later that evening, officers took Bradshaw to the hospital to have his leg examined, and they returned him to cell three once back at the jail. The shift-change reports prepared on the evening of June 14, 2014, and on June 15, 2014, do not suggest that Bradshaw was suicidal. BCCF officers communicated a prisoner's suicidal status via shift-change reports and word of mouth. Several officers said they did not know that Bradshaw was on suicide watch.

By the time Corporal Rose arrived for his shift on June 15, 2014, Bradshaw had bedding and clothing. Bradshaw, seeming in good spirits, received breakfast and

lunch.  Officers last saw him alive at 11:45 a.m.  Just after noon, they found him dead in his cell after he hanged himself with a pillowcase or sheet.

Plaintiff Kathy George, Bradshaw's mother, sued on behalf of her son's estate, asserting claims under 42 U.S.C. § 1983 that Defendants Corporal Randie Rose, Beaver County, and Beaver County Sheriff Cameron Noel violated Bradshaw's Fourteenth Amendment rights and "Utah Code Article I, Section 7."  Plaintiff voluntarily dismissed her state-law claim against Defendants.  The district court granted summary judgment to all parties on her remaining claims because the law entitled Rose and Noel to qualified immunity and no Beaver County policy violated Bradshaw's constitutional rights.

## II.

We review a grant of summary judgment based on qualified immunity de novo, applying the same standard as the district court.  Becker v. Bateman, 709 F.3d 1019, 1022 (10th Cir. 2013) (citation omitted).  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[O]n summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation and alterations omitted).  But when a defendant asserts qualified immunity on summary judgment, the burden shifts, and the plaintiff must show that (1) the defendant's conduct violated a constitutional right and (2) that the constitutional right was clearly

established at the time of the incident. Becker, 709 F.3d at 1022 (citation omitted).

Courts may address either prong first. Id. (citation omitted).

III.

Plaintiff argues the district court wrongfully granted Beaver County summary

judgment because a reasonable jury could find the County's failure to implement

sufficient safeguards or train its corrections officers on suicide prevention constituted

deliberate indifference. Plaintiff also appeals the district court's determination that

the law entitled Noel and Rose to summary judgment based on qualified immunity.

She argues that a reasonable jury could find Noel liable as a supervisor and that Rose

acted with deliberate indifference to Bradshaw's suicide risk.

A.

We conclude the district court properly granted summary judgment to Beaver

County. Plaintiff cannot establish that the County was deliberately indifferent by

failing to train its corrections officers on preventing suicide, failing to train on

preparing shift-change reports, or failing to install CCTV monitoring cameras in

certain cells.

In enacting § 1983, Congress did not intend to subject municipalities to

liability unless an official policy caused a constitutional tort. Schneider v. City of

Grand Junction Police Dep't, 717 F.3d 760, 770 (10th Cir. 2013) (quoting Monell v.

Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)). Thus, municipalities are responsible

only for their own illegal acts and "are not vicariously liable under § 1983 for their

employees' actions." Connick v. Thompson, 563 U.S. 51, 60 (2011) (citations

7

omitted).  Rather, to hold a municipality liable, a plaintiff must prove that (1) an official policy or custom (2) caused the plaintiff's constitutional injury and (3) that the municipality enacted or maintained that policy with deliberate indifference to the risk of that injury occurring.  See Schneider, 717 F.3d at 769−71.  Municipal liability is "most tenuous where a claim turns on a failure to train."  Connick, 563 U.S. at 61 (citation omitted).  But a municipality's decision not to train its officers rises to the level of an official government policy under § 1983 only when the failure to train "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'"  Id. (second alteration in original) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)).

Deliberate indifference requires proof that a municipal actor disregarded a known or obvious consequence of his action.  Id. (citation omitted).  For example, when policymakers have actual or constructive notice that a training deficiency caused city employees to commit constitutional violations, the city may be deliberately indifferent if it chooses to maintain its deficient training program.  Id. (citation omitted).  Ordinarily, a plaintiff must prove a pattern of untrained employees' constitutional violations to show deliberate indifference.  Id. at 62 (citation omitted).  "Evidence of a pre-existing pattern of violations is only unnecessary in a narrow range of circumstances . . . in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious."  Waller v. City & Cnty. of Denver, 932 F.3d 1277, 1285 (10th Cir. 2019) (internal quotation marks omitted) (quoting Connick, 563 U.S. at 63−64).

8

Plaintiff contends Beaver County was deliberately indifferent to the "predictable consequences" of failing to train its officers on its suicide-prevention policy and shift-change reports and failing to install CCTV monitoring cameras in the cells housing suicidal inmates. First, concerning Plaintiff's suicide-prevention-policy argument, Plaintiff argues Beaver County neither provided its officers a copy of its suicide-prevention policy nor trained them on it. But BCCF's suicide-prevention policy, along with the rest of the policy handbook, was available to officers "on every computer in the facility." And all Beaver County corrections officers complete a twelve-week training program at the Utah POST Academy. POST training includes a four-hour suicide-prevention training, and BCCF sponsors an annual mental-health training, which sometimes includes suicide-prevention training. After POST certification, BCCF officers also receive on-the-job training, called FTO training, to learn how more experienced officers implement BCCF policies. All deputies on duty June 13−15, 2014, were POST-certified officers in good standing. Although some officers testified that they were unfamiliar with BCCF's specific suicide-prevention policy, BCCF officers received some suicide-prevention training and could view the policy. While BCCF could have offered more or better suicide-prevention training, "showing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability." Connick, 563 U.S. at 68.

Plaintiff contends a pattern of misconduct exists showing Beaver County was deliberately indifferent "to the predictable consequences of failing to train its officers on suicide prevention." She relies on the following: (1) the arresting officer failed to

9

notify a mental-health provider when Bradshaw asked her to kill him twice; (2) the intake officer placed Bradshaw on suicide watch but did not put him in a suicide smock, log fifteen-minute safety-checks, or notify a mental-health provider that he was suicidal; (3) a booking officer failed to notify a mental-health provider that Bradshaw was suicidal; (4) Corporal Rose transferred Bradshaw to cell three, which lacked CCTV monitoring, without authorization from a mental-health provider; and (5) Rose failed to ensure other officers knew Bradshaw was suicidal, placed him in a suicide smock, or performed fifteen-minute checks.  But Plaintiff's examples do not show a pattern of constitutional violations by untrained officers over time.  They instead demonstrate that officers failed to comply with the County's suicide-prevention policy during this incident—a showing insufficient to establish deliberate indifference to suicide-prevention training.  And Plaintiff does not argue that proving a pattern of constitutional violations is unnecessary here.  See Waller, 932 F.3d at 1285 ("Evidence of a pre-existing pattern of violations is only unnecessary in a narrow range of circumstances . . . in which the unconstitutional consequences of a failure to train are highly predictable and patently obvious."  (internal quotation marks omitted)).  Thus, on the facts taken in the light most favorable to Plaintiff, Plaintiff cannot establish that BCCF has a policy of failing to train its officers on suicide prevention.  See Connick, 563 U.S. at 61 (stating a municipality's failure to train its officers rises to the level of an official government policy when that failure "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact'" (second alteration in original)).

10

Second, Plaintiff argues Beaver County failed to train its officers on shift-change reports. As support, Plaintiff asserts that no report after the initial intake officer's suggested Bradshaw was suicidal, even though Rose knew Bradshaw was. Rose also did not recall whether he orally communicated that information to the next shift. But, like Plaintiff's suicide-prevention-policy argument, a failure to comply with BCCF's shift-change-report policy does not evidence a pattern of constitutional violations amounting to a policy of failing to train on shift-change reports. See Appellant's App. Vol. 1 Part II at 326 (BCCF officers conveyed shift-change information to the oncoming shift orally, via handwritten notes in the control room, or by written reports.). Failing to comply with jail policy does not amount to a constitutional violation on its own. See Davis v. Scherer, 468 U.S. 183, 194 (1984). Municipal-liability claims require proof that the municipal entity acted with deliberate indifference. Schneider, 717 F.3d at 770 (citations omitted). And proving deliberate indifference ordinarily requires showing a pattern of similar instances because "continued adherence to an approach that [policymakers] know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action." Connick, 563 U.S. at 62 (citation omitted). Plaintiff offers no evidence showing that Beaver County failed to comply with its shift-change-report policy on any occasion other than this incident. Thus, Plaintiff cannot prove Beaver County acted with deliberate indifference in failing to train its officers on shift-change reports.

Last, Plaintiff argues that Beaver County's failure to install CCTV monitoring cameras in the cells used for suicidal inmates in violation of its suicide-prevention policy amounted to deliberate indifference. But again, Plaintiff complains only that the County violated its policy here and offers no evidence of a pattern of constitutional violations showing the County's deliberate indifference to the consequences of failing to install CCTV monitoring cameras in those cells. After all, no inmate had ever committed suicide at BCCF before this incident. And Plaintiff does not argue that proving a pattern of constitutional violations is unnecessary. Because Plaintiff cannot show that the County was deliberately indifferent in failing to train its corrections officers on preventing suicide and preparing shift-change reports or in failing to install CCTV monitoring cameras in certain cells, the district court properly granted summary judgment to Beaver County.

B.

The district court granted Sheriff Noel summary judgment on qualified immunity because "[t]here is no evidence that Sheriff Noel knew that . . . Bradshaw presented a substantial risk of suicide." George v. Beaver County, No. 2:16-CV-1076 TS, 2019 WL 3892940, at *5 (D. Utah Aug. 19, 2019). Plaintiff claims the district court erred because a reasonable jury could find Noel liable as a supervisor as a result of his "lax enforcement and utter lack of training on the BCCF Suicide Prevention Policy." We disagree.

Supervisory liability under § 1983 may attach to a defendant-supervisor who creates, promulgates, or implements a policy that injures that plaintiff's constitutional

12

rights. Cox v. Glanz, 800 F.3d 1231, 1248 (10th Cir. 2015) (quoting Brown v. Montoya, 662 F.3d 1152, 1163–64 (10th Cir. 2011)). But supervisors are not vicariously liable for their employees' acts. See id. So a plaintiff must "show an 'affirmative link' between the supervisor and the constitutional violation" to hold the supervisor liable. Est. of Booker v. Gomez, 745 F.3d 405, 435 (10th Cir. 2014) (quoting Schneider, 717 F.3d at 767). To show an "affirmative link" between a supervisor and the alleged constitutional injury, a plaintiff must prove: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." Dodds v. Richardson, 614 F.3d 1185, 1199–200 (10th Cir. 2010) (citing Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)).

Courts treat jail-suicide claims as a failure to provide medical care, Barrie v. Grand County, 119 F.3d 862, 866 (10th Cir. 1997), which implicates the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976) (holding that a prison official's deliberate indifference to a prisoner's "serious medical needs" violates the Eighth Amendment). The Fourteenth Amendment's due-process clause provides pretrial detainees the same protection for medical attention as convicted inmates receive under the Eighth Amendment. Barrie, 119 F.3d at 867 (citation omitted). And we apply the same deliberate-indifference standard no matter which amendment provides the constitutional basis for the claim. Strain v. Regalado, 977 F.3d 984, 989 (10th Cir. 2020) (citing Est. of Hocker v. Walsh, 22 F.3d 995, 998 (10th Cir. 1994)), cert. denied, 142 S.

13

Ct. 312 (2021).   Plaintiff's supervisory-liability claim in this case requires

"a *particularized* state of mind: actual knowledge by a prison official of an individual

inmate's substantial risk of suicide."  Cox, 800 F.3d at 1249.

"[P]rison officials are deliberately indifferent if they fail to take reasonable steps

to protect a pre-trial detainee or an inmate from suicide when they have subjective

knowledge that person is a substantial suicide risk."  Crane v. Utah Dep't of Corr., 15

F.4th 1296, 1307 (10th Cir. 2021) (citation omitted).  Thus, to hold Noel liable as a

supervisor, Plaintiff must demonstrate that he had "actual knowledge . . . of [Bradshaw's]

substantial risk of suicide."  Cox, 800 F.3d at 1249.  That knowledge could have come

from his subordinates even if he "had no personal interaction with [the prisoner] or direct

and contemporaneous knowledge of his treatment."  Id. at 1254.

Plaintiff puts forth no evidence showing Noel had actual knowledge of

Bradshaw's substantial risk of suicide.  See, e.g., Appellant's App. Vol. 1 Part I at 93

(stating that Noel "was unaware Mr. Bradshaw was incarcerated at the Jail on June 15,

2014").  Instead, she contends Supreme Court precedent only requires Noel to have

known of the "generalized risks presented by conditions at his jail," rather than "the risk

to a specific detainee," to have the culpable state of mind.  And she argues that she

presented evidence to the district court from which a jury could reasonably conclude that

Noel endorsed a widespread custom or policy at BCCF of failing to report suicide risks

and that he failed to train officers on suicide prevention.  According to Plaintiff, "[t]he

very existence of the Suicide Prevention Policy and accompanying procedures . . . should

have put Sheriff Noel on notice of the substantial risk presented by suicidal detainees"

14

because "those policies . . . required updating and implementation," and Noel failed to act "in the face of a substantial risk of suicide to BCCF inmates."

Plaintiff is correct that Farmer v. Brennan, 511 U.S. 825 (1994), "opened the door to a showing that a supervisory jail official could have the requisite mens rea if he knew of the generalized risks presented by conditions at his jail, not merely the risk to a specific detainee."  Indeed, Farmer states, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk . . . for reasons personal to him or because all prisoners in his situation face such a risk."  511 U.S. at 843.  But Farmer concerned deliberate indifference to an inmate's safety who "would be particularly vulnerable to sexual attack," id. at 831, and we have applied its deliberate-indifference-to-a-generalized-risk requirement in cases involving the risk of sexual assault.  See, e.g., Tafoya v. Salazar, 516 F.3d 912, 915–16 (10th Cir. 2008) (stating "[t]he official's knowledge of the risk need not be knowledge of a substantial risk to a *particular* inmate" in a prison-sexual-assault case).  But in Cox, we determined that supervisory-liability in the inmate-suicide context requires the prison official to have had actual knowledge of an individual inmate's substantial risk of suicide.  800 F.3d at 1249.  We acknowledged that "we have taken a different stance on the knowledge of risk that must be alleged" in the prison-sexual-assault context.  Id. at 1251 n.11.  But we found those cases distinguishable because one can assess the risk of sexual assault from the sexual victimizer's characteristics and other external factors, while "a substantial risk of suicide may be

15

impossible to discern unless the particular inmate reveals indicia of that risk to prison officials." Id. (citations omitted).

Still, Plaintiff urges us to reject reading Cox to mean "that no supervisory liability can attach to a jail official unless that official subjectively knows of the suicide risk to a particular inmate." Under that reading, Plaintiff contends, jail officials could implement unconstitutional policies leading directly to inmate suicide and "escape liability by simply maintaining ignorance of the day-to-day, inmate-specific operations of their jail." But Cox is clear: § 1983 jail-suicide supervisory-liability claims require the supervisor to have known that the specific inmate at issue presented a substantial risk of suicide. Id. at 1250; see also Crane, 15 F.4th at 1307 ("[A]s we explained in Cox v. Glanz, prison officials are deliberately indifferent if they fail to take reasonable steps to protect a pre-trial detainee or an inmate from suicide when they have subjective knowledge that person is a substantial suicide risk."). "[W]e are bound to follow our . . . precedent, absent *en banc* reconsideration or a super[s]eding contrary decision by the Supreme Court." United States v. Austin, 426 F.3d 1266, 1278 n.4 (10th Cir. 2005) (citations omitted). Thus, to defeat Noel's summary-judgment motion, Plaintiff must offer evidence showing Noel had actual knowledge of Bradshaw's substantial risk of suicide, rather than a generalized risk. Plaintiff has pointed to no evidence showing Noel had actual knowledge of Bradshaw's substantial risk of suicide.[2]

---

[2] Plaintiff also argues that Cox is factually dissimilar to this case because "none of the jail officials in Cox knew or could have known that the detainee presented a suicide risk," and therefore none of Sheriff Glanz's subordinates could have communicated that knowledge to him. Appellant's Br. at 38. In Plaintiff's

Even if § 1983 jail-suicide supervisory-liability claims only required the actor to have known of a generalized risk of suicide at the prison, the record does not show Noel knew of any generalized risk. That officers ignored portions of the County's suicide-prevention policy is not enough to raise a fact issue that Noel knew about a generalized risk to suicidal detainees, contrary to Plaintiff's argument, because no inmate had ever successfully committed suicide at the BCCF before this incident. Appellant's App. Vol. 1 Part I at 93 (declaring that Noel "had no reason to believe that there was any defect of [sic] problem with the way the policy was enforced or implemented at the Jail prior to Troy Bradshaw's unfortunate death"). And, to the extent Plaintiff contends that Noel endorsed a custom or policy of failing to report suicide risks and train officers on suicide-prevention, thus creating a generalized risk to suicidal detainees, Plaintiff failed to show such a custom or policy existed. As discussed above, Plaintiff demonstrated no pattern of untrained employees' constitutional violations showing deliberate indifference to suicide-prevention or shift-change-report training to rise to the level of County policy or custom. See Connick, 563 U.S. at 61.[3] Rather, Plaintiff only showed a failure to comply with the

---

case, the evidence shows that Corporal Rose was present during Bradshaw's booking assessment and learned that Bradshaw was suicidal. But though at least some of Sheriff Noel's subordinates knew that Bradshaw was suicidal, no evidence shows they communicated that to Noel.

[3] "Deliberate indifference . . . is defined differently for Eighth Amendment and municipal liability purposes." Barney v. Pulsipher, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998). "In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official" while, "[i]n the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it." Id. (citation omitted). We do not equate the two deliberate-indifference standards here.

County's policies in Bradshaw's case.  And any argument that Noel affirmatively endorsed not reporting suicide risks in shift-change reports, rather than failing to train on reporting them, also falls short because Plaintiff does not attempt to prove a pattern evidencing that custom.  Because there is no evidence that Noel knew Bradshaw presented a substantial risk of suicide, the district court properly granted summary judgment to Sheriff Noel.

## C.

Last, we affirm the district court's grant of summary judgment to Corporal Rose.  Whether Rose violated Bradshaw's constitutional rights by placing Bradshaw in a regular cell and failing to inform other officers of his suicide risk was not clearly established in June 2014.

In the qualified-immunity context, "[a] clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Cummings v. Dean, 913 F.3d 1227, 1239 (10th Cir. 2019) (internal quotation marks omitted) (citing Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam)).  "Ordinarily, a plaintiff may satisfy this clearly-established-law standard by identifying an on-point Supreme Court or published Tenth Circuit decision that

---

We note only that Plaintiff cannot show the County was deliberately indifferent (under the municipal-liability standard) in failing to train its corrections officers on preventing suicide and preparing shift-change reports.  Plaintiff is therefore unable to show the County had a widespread custom or policy of failing to train on suicide prevention and shift-change reports.  As a result, Plaintiff cannot rely on that policy or custom to raise a fact issue concerning whether Noel was deliberately indifferent (under the Eighth or Fourteenth Amendment standard) to a substantial risk of suicide to prison inmates.

18

establishes the unlawfulness of the defendant's conduct," or "the clearly established

weight of authority from other courts must have found the law to be as the plaintiff

maintains." Id. (quotation and brackets omitted).[4] "[T]he precedent must have clearly

established the right 'in light of the specific context of the case, not as a broad general

proposition.'" Frasier v. Evans, 992 F.3d 1003, 1014 (10th Cir. 2021) (citation omitted).

While we do not require a case directly on point, existing precedent "must have placed

the statutory or constitutional question beyond debate." Id. (citation omitted). "The

plaintiff bears the burden of citing to us what he thinks constitutes clearly established

law." Crane, 15 F.4th at 1303 (quoting Thomas v. Durastanti, 607 F.3d 655, 669 (10th

Cir. 2010)).

Plaintiff contends she presented sufficient evidence from which a fact finder could

determine that Rose knew Bradshaw presented a suicide risk and acted with deliberate

indifference to that risk by placing him in a regular cell and failing to inform other

officers of that suicide risk "formally or otherwise." But, on June 13−15, 2014, when the

incident occurred, no Tenth Circuit or Supreme Court decision put Rose on notice that his

conduct violated Bradshaw's constitutional rights. As of June 1, 2015, no Supreme Court

---

[4] The Supreme Court has left open whether only its precedent may clearly establish law. See D.C. v. Wesby, 138 S. Ct. 577, 591 n.8 (2018) ("We have not yet decided what precedents—other than our own—qualify as controlling authority for purposes of qualified immunity."); Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 8 (2021) (per curiam) ("Even assuming that Circuit precedent can clearly establish law for purposes of § 1983, LaLonde is materially distinguishable and thus does not govern the facts of this case."). Yet "we do not think only Supreme Court precedents are relevant in deciding whether a right is clearly established." Ullery v. Bradley, 949 F.3d 1282, 1292 (10th Cir. 2020).

decision established a right to the "proper implementation of adequate suicide prevention protocols" or "even discusse[d] suicide screening or prevention protocols." Taylor v. Barkes, 575 U.S. 822, 826 (2015) (per curiam). In Cox, we determined that "an inmate's right to proper prison suicide screening procedures during booking . . . was not clearly established in July 2009." 800 F.3d at 1247. But even Cox did not establish in 2015 that Sheriff Glanz's conduct violated a constitutional right. "There, we assumed the existence of a constitutional violation and held that the right at issue—'an inmate's right to proper prison suicide screening procedures during booking'—wasn't clearly established." Perry v. Durborow, 892 F.3d 1116, 1124 (10th Cir. 2018) (quoting Cox, 800 F.3d at 1247).

But Plaintiff argues Barrie, 119 F.3d at 866−67, clearly established a suicidal pretrial detainee's right to reasonable safeguards against harming himself in 1997, long before Bradshaw's death in 2014. Barrie concerned a pretrial detainee's post-booking suicide in the county jail's "drunk tank." Id. at 863−64. Grand County officers arrested Alan Ricks around 6:00 p.m. on October 26, 1991; at 7:30 p.m., they placed him in the drunk tank after booking and permitted him to keep his street clothes; and by 2:00 a.m., Ricks had hanged himself with his sweatpants draw cord. Id. Ricks's estate and family members filed suit against the county and several county officials. Id. at 863. We clarified that prisoners—pretrial detainees or postconviction inmates—have claims against their custodians for failure to provide adequate medical attention, including jail-suicide claims, only when the custodian knows of the risk involved and is deliberately indifferent to it. Id. at 868–69. We determined that the defendants were not deliberately indifferent to a substantial risk of suicide, id. at 869, and did not hold that the defendants'

20

conduct violated Ricks's constitutional rights.  Thus, <u>Barrie</u> did not clearly establish a right to proper implementation of prison-suicide-prevention protocols in this circuit. Plaintiff failed to carry her burden to point us to law clearly establishing that right, and, based on our review of the caselaw, circuit precedent did not clearly establish that right in June 2014.  Thus, Rose's conduct did not violate clearly established law, and he is entitled to qualified immunity.

The district court properly granted summary judgment to the County, Noel, and Rose.

AFFIRMED.